IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| MYGYM, LLC,<br><br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br><br>VINCE ENGLE,<br><br>　　　　　　　Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 1:06-CV-130 TC |

VINCE ENGLE,

　　　　　　　Counterclaimant,

　　vs.


MYGYM, LLC,

　　　　　　　Counterdefendant.

_____

VINCE ENGLE,

　　　　　　　Third-Party Plaintiff,

　　vs.


WAYNE CARLSON and DALE KARREN,

　　　　　　　Third-Party
　　　　　　　Defendants.

At the center of this trademark and contract dispute are the MyGym Fitness System

(fitness equipment) and the MyGym trademark, the ideas for which originated with Vince Engle.

In 2004, Mr. Engle—along with Wayne Carlson and Dale Karren—formed MyGym LLC to further develop, market, and sell the MyGym Fitness System.  But that business relationship, including a License Agreement between Mr. Engle and MyGym LLC, recently disintegrated and the parties have filed competing complaints in this court.

Mr. Engle, as registered owner of the MyGym trademark, has filed a Motion for Preliminary Injunction against MyGym LLC, Wayne Carlson, and Dale Karren, in which he seeks, among other things, an order barring their use of the MyGym trademark, related trade dress, and the MyGym fitness equipment design.  Because Mr. Engle has not established irreparable harm, and because the balance of harms weighs in favor of MyGym LLC and its principals, the court finds that Mr. Engle is not entitled to injunctive relief at this time. Accordingly, Mr. Engle's Motion for Preliminary Injunction is DENIED.

## BACKGROUND

In April 2004, Vince Engle (who has been involved in the health and fitness industries since 1985) conceptualized a piece of health equipment that would become known as the MyGym Fitness System.  In May 2004, he started building prototypes out of wood and PVC pipe in his garage, and during the summer of 2004 he further developed the exercise equipment.  He also decided to use the term "MyGym" to name and market the equipment.  In September 2004, he presented his ideas and latest prototype to businessmen Wayne Carlson and Dale Karren, both of whom allegedly signed confidentiality agreements.

The three men then agreed to form a company to undertake production and marketing of the equipment.  They negotiated the percentage of interest each would receive in the company, with Mr. Engle accepting less than fifty-one percent control of the company in exchange for a

smaller stake (he has a twenty-seven percent stake in the company now) and a six percent royalty calculated based on the company's gross sales.  In November 2004, they formed MyGym, Inc., which was then converted to a limited liability company in December 2004.[1]

**The License Agreement**

On December 1, 2004, Mr. Engle and MyGym LLC executed a License Agreement.  The terms of that Agreement acknowledge Engle as the "developer and owner" of the MyGym fitness equipment system, "including, without limitation, all upgrades, future versions, and/or variations thereof," as well as the "MyGym" name, "together with certain other trade names, logos, trademarks and service marks that are not registered or that are pending registration . . . ." (License Agreement Recitals A & B[2] (Def.'s Ex. E).)  MyGym LLC further acknowledged that "the patents, patents pending, and Trademarks delivered to [MyGym LLC] by [Engle] or which may be acquired by [MyGym LLC] for [Engle] pursuant to the License Agreement or in furtherance of the MyGym Fitness System, are the sole and exclusive property of [Engle] . . . ." (Id. ¶ 7.3 (emphasis added).)  And MyGym LLC agreed that it would not "contest the sole and exclusive rights of [Engle] to the MyGym Fitness System (patented or unpatented) and Trademarks and other information and intellectual property and items delivered or provided to [MyGym LLC], or which [MyGym LLC] develops or obtains access to under this License Agreement, nor shall [MyGym LLC] claim any interest in such property."  (Id. (emphasis

---

[1]Eric Stilson also received a small membership interest in the new company and a portion of Engle's royalties in exchange for producing an infomercial to market the MyGym Fitness System on television.  Other individuals have since become investors in MyGym LLC.

[2]The License Agreement expressly incorporates the Recitals into the terms of the contract. (Def.'s Ex. E.)

added).)  Further, the parties stipulated that

> if [MyGym LLC] breaches this Agreement . . ., [Engle] shall have <u>no adequate</u>
> <u>remedy at law</u>.  Therefore, [MyGym LLC] expressly consents and agrees that
> [Engle] may, in addition to any other available remedies, obtain an injunction
> and/or temporary restraining order to terminate or prevent the continuation of any
> existing default or violation, and to prevent the occurrence of any threatened
> default or violation by Licensee of this License Agreement, and that such
> injunction or order may be issued without the necessity of posting bond.

(<u>Id.</u> ¶ 13 (emphasis added).)

During negotiations concerning company formation and the License Agreement, Mr.

Engle made certain representations regarding the status of the MyGym mark.  Mr. Engle testified

during the evidentiary hearing that he told Mr. Carlson and Mr. Karren that his brother had

abandoned the name MyGym (in 2000, his brother had filed, and later abandoned, an <u>application</u>

to register the "MyGym" mark with the United States Patent and Trademark Office for use in

promoting a chain of health and fitness clubs)[3] and that he had permission from his brother to use

the MyGym name for the newly developed equipment and proposed business venture.

Testimony from Mr. Carlson, Mr. Karren, and Mr. Engle's former attorney David Hirschi

(who drafted the License Agreement) suggests that Mr. Engle represented that he had some

federally registered rights in the word "MyGym."  Moreover, in the Agreement itself, Recitals A

and B provide that Engle is "developer and owner of MyGym®™ (Patent Pending) fitness

equipment" and that the "MyGym Fitness equipment system has been registered with the

appropriate agencies of the state of Utah and with the United States Patent and Trademark

Office."

The written recitals were not accurate because "MyGym" was not a registered trademark

---

[3]<u>See</u> Pls.' Ex. 1; Def.'s Ex. S.

at the time the License Agreement was signed, and there was no patent application pending. Indeed, Mr. Engle did not submit a patent application to the United States Patent and Trademark Office until December 10, 2004 (see Pls.' Ex. 9), and he did not file an "intent to use" application to obtain a registered trademark until January 3, 2005.  (See Pls.' Ex. 2.)

The parties dispute whether the representations were material to formation and performance of the License Agreement.

**Amendment to the License Agreement**

The parties amended the License Agreement on February 1, 2005, to add the condition that,

> should [MyGym LLC] dissolve for any reason, and the result of that dissolution be that [Engle] regains control of all rights to the MyGym Fitness System, free and clear of the License, [Engle] agrees that any income derived through the sale or re-licensing of the MyGym Fitness System shall be paid to the original Unit holders of [MyGym LLC] (including [Engle]) on a pro-rata basis up to the amount of their original investment . . . .

(First Amendment to License Agreement ¶ 10.8 (emphasis added) (Def.'s Ex. E).)  No other relevant portions of the License Agreement were modified, and the First Amendment expressly stated that, "[e]xcept as modified hereby, the terms and conditions of the Agreement remain in full force and effect between the parties as of the date of this First Amendment."  (Id.)

**Patent Application**

As noted above, the first patent application was filed on December 10, 2004—ten days after the License Agreement was executed.  Also, according to Mr. Carlson, after the License Agreement was executed, numerous alterations to the exercise device were required to make it commercially and economically feasible.  The vast majority of these changes, MyGym LLC says,

were made by Mr. Carlson and financed by MyGym LLC.  (See Decl. of Wayne Carlson ¶ 2;
Pls.' Mem. Opp'n to Mot. for Prelim. Inj. at 12.)  According to Mr. Engle, he, with the assistance
of MyGym LLC employees (principally Mr. Carlson), continued to develop and redefine his
concept, with the core concept remaining the same.  (Second Decl. of Vince K. Engle ¶ 18.)  And
he allowed the modification in reliance on Paragraph 7.3 of the License Agreement providing
that anything developed by MyGym LLC would remain his intellectual property.  (Id.)

On December 2, 2005, MyGym LLC's and Mr. Engle's attorney at Kirton & McConkie
filed another patent application naming Mr. Engle as the sole inventor.  But on July 31, 2006,
Kirton & McConkie informed Mr. Engle that, based on information provided by Mr. Carlson, it
had just filed an amendment to the patent application to list Wayne Carlson as an inventor.  The
July 31, 2006 letter questioned Mr. Engle's claim of exclusive ownership of the intellectual
property rights.  (Def.'s Ex. O.)  Mr. Engle contends that this act is a violation of MyGym LLC's
obligation under the License Agreement to refrain from challenging Mr. Engle's rights to the
MyGym fitness equipment.

**Trademark Application and Registration**

On May 9, 2005, Mr. Engle submitted another "intent to use" trademark application.
(See Def.'s Ex. T.)  Although the trademark application was submitted in Mr. Engle's name, it
was filed with the knowledge and cooperation of MyGym LLC and its principals, Mr. Carlson
and Mr. Karren, all of whom retained the law firm Kirton & McConkie to obtain the registered
trademark in Mr. Engle's name.  Furthermore, the use of the mark in commerce, a necessary
prerequisite, appears to have been accomplished through Mr. Engle's related company or
licensee, MyGym LLC.  The United States Patent and Trademark Office issued a registered

trademark to Mr. Engle on October 10, 2006.  (See id.; Def.'s Ex. H.)

**Initial Marketing and Distribution**

MyGym LLC began marketing and selling the equipment in March 2005.  The company's efforts included (a) the production and nationwide placement of print advertising; (b) the production, testing and placement of the infomercial developed by Eric Stilson; (c) and work by Mr. Engle and other MyGym LLC principals and employees at trade shows and expositions.

**Trademark Infringement Claim by California Company**

On June 13, 2005, Mr. Engle received a letter from an attorney representing an entity called Gym Consulting, Inc. which had federally registered rights in the trademark "My Gym." The letter asked Mr. Engle to cease all use of the MyGym mark and the domain name www.mygym.net.  The company also threatened to file opposition proceedings in the Trademark Office against the pending "MyGym" trademark applications.  (See Pls.' Ex. 7.)

After settlement negotiations between Gym Consulting on the one hand and MyGym LLC and Mr. Engle on the other hand, the parties entered into a Settlement Agreement, dated March 1, 2006.  As a result of the Settlement Agreement, MyGym LLC and Mr. Engle are required to limit their use of the MyGym mark (for example, they may not market clothing using the MyGym mark), they must pay money to Gym Consulting, and MyGym LLC must change its name.  (See Pls.' Ex. 14.)  MyGym LLC and Mr. Engle, both of whom were parties to the Settlement Agreement, are still negotiating how they will divide up their financial obligations to Gym Consulting.

**Bay Street Brands LLC as Exclusive Distributor**

On January 12, 2006, MyGym LLC entered into an exclusive Distribution Agreement

with Bay Street Brands LLC.  (Def.'s Ex. J.)  The Distribution Agreement grants Bay Street the exclusive right to sell and distribute MyGym products in the United States.  In order to retain its sole distribution rights, Bay Street must sell 80,000 MyGym units in the first twelve months of the Distribution Agreement and 240,000 units in the second year of the Agreement.  To date, Bay Street has sold approximately 15,000 units.

MyGym LLC is to receive "commissions" and "royalties" from these sales.  Although it is entitled to keep the "commissions" as revenue, under ¶ 7.1 of the Distribution Agreement the "royalties" (separately defined and calculated as 6% of Gross Revenues) were to be paid to MyGym LLC "to permit MyGym to fulfill its contractual obligations to pay royalties to the original inventors or developers of the Products and producer of the infomercial."  That is, apparently MyGym LLC was to pass the "royalties" along to Mr. Engle to satisfy its initial obligations under the License Agreement.

According to Bay Street representative Denise Kovac (who testified at the evidentiary hearing), Bay Street is confused as to who (between Mr. Engle and MyGym LLC) owns the rights to the MyGym mark and fitness equipment.  She testified that Bay Street, at the request of its shareholders, has stopped marketing and selling MyGym products so as to avoid being pulled into the legal dispute.  She further testified that the legal dispute between Mr. Engle and MyGym LLC has interfered with Bay Street's ability to obtain necessary financing and re-negotiate the Distribution Agreement, which Bay Street believes is contrary to the realities of the marketplace. Finally, she testified that she would not be able to calculate lost business opportunities if Bay Street is not able to continue marketing the MyGym fitness system.

**Non-Payment of Royalties and Termination of the License Agreement**

During the time the parties were applying for various intellectual property protections, dealing with Gym Consulting's trademark infringement claim, and establishing an exclusive distribution agreement with Bay Street, a dispute about payment of royalties arose.

Under the License Agreement, Mr. Engle was to receive his first royalty payment on May 1, 2005, and his second on July 1, 2005. But these payments were not made. On August 11, 2005, Mr. Engle sent MyGym LLC a Notice of Default and Demand for Payment, as required by Paragraph 10.3(b) of the License Agreement. (Second Decl. of Vince Engle ¶ 26.) MyGym LLC did not pay because it did not have the ability to pay.

On August 23, 2005, Mr. Engle resigned as a manager of MyGym LLC. But he agreed to forebear payment of royalties due him under the License Agreement either until Mr. Carlson or Mr. Karren began to receive money from the company, or by June 1, 2006, whichever occurred first. Apparently, the provision in the Bay Street Distribution Agreement regarding payment of "royalties" was a vehicle created by Mr. Engle and MyGym LLC to assure payment of the past-due royalties.[4]

---

[4]Nothing in the record reflects a complaint about the purported lack of value of the intellectual property Mr. Engle brought to the License Agreement. Indeed, the record contains two unsigned documents apparently drafted in 2005 that suggest the parties were attempting to re-negotiate their License Agreement in light of market realities, not in light of the value of the property licensed in December 2004. Those two documents are the unsigned Memorandum of Understanding (Def.'s Ex. W) and the unsigned Amended and Restated License Agreement (Def.'s Ex. U).

The Amended and Restated License Agreement (albeit unsigned) retains the language in Recitals A and B that MyGym LLC now claims was a material misrepresentation. It also contains language that the amended agreement supercedes the December 1, 2004 License Agreement and relates back to the December 1, 2004 date. "All acts of the parties with respect to this Agreement between December 1, 2004, and the date set forth above are hereby acknowledged, agreed to, ratified, and confirmed." (Def.'s Ex. U at 2.) It acknowledges that

On July 26, 2006, in light of MyGym's failure to pay royalties, Mr. Engle again gave

written notice of default as required under the License Agreement.  In his notice letter, Mr. Engle

told MyGym LLC that

> [t]he continual lack of communication, no reporting, no payments and a disregard
> for the value which I have contributed [as] represented by the License Agreement
> has now moved me to a position to look at <u>changing the status of the asset where
> the asset is more liquid and I have control over that liquidity</u>. . . . I contacted Mark
> Baker [at Bay Street] and have expressed my interest in selling the patents and
> rights associated.  This letter will also serve as my notice to you that <u>I intend to
> sell the patents and rights</u>.  If Mark [Baker] is not interested or if we can't find a
> reasonable value then I will start searching for an appropriate qualified buyer. . . .
> Again, please do not interpret this letter as my lack of appreciation of what you
> are doing and have done, but as a resolve to get the past current and to move
> forward slowly.  <u>I have demands in my life now that insist that I consider selling
> the patents, this is from outside obligations that I am pressured to resolve and that
> I have held off as long as possible</u>.

(Def.'s Ex. M (emphasis added).)  On October 5, 2006, Mr. Engle terminated the License

Agreement according to the requirements in ¶ 10.3 ("Termination Upon Notice") of the License

Agreement.

**<u>The Lawsuit and Request for Preliminary Injunctive Relief</u>**

Immediately after Mr. Engle submitted his termination notice, MyGym LLC filed the

current lawsuit against Mr. Engle and told him in an October 11, 2006 letter that he was in

breach of the License Agreement and could not unilaterally change his alleged oral agreement to

_____

"Trademarks" (defined in the Agreement) are "pending."  (<u>Id.</u> at ¶ 9(a).)
        In the unsigned Memorandum of Understanding, the language provides that "MyGym and
Engle recognize and acknowledge that the License Agreement as drafted and executed by the
parties did not take into account certain realities of commencing the marketing of the MyGym
Fitness system and other aspects of the business relationship created by the License Agreement
and Engle's investment in MyGym, LLC."  (Unsigned 2005 Memorandum of Understanding
between Engle and MyGym (Def.'s Ex. W), Recital B.)  The record does not clarify what the
parties meant by "other aspects of the business relationship" and "Engle's investment in MyGym,
LLC."

further defer payment of royalties.  (Def.'s Ex. Q.)  MyGym LLC's Complaint asserts causes of

action for unfair competition, deceptive trade practices, breach of contract, breach of fiduciary

duty, and interference with contractual and expected business relationships.

On October 30, 2006, Mr. Engle filed counterclaims, third-party claims and his Motion

for Preliminary Injunction.  He asserts causes of action for breach of the License Agreement,

breach of confidentiality agreements, trademark and trade dress infringement, unfair competition,

and tortious interference with prospective business relations.  He asks the court to enjoin MyGym

LLC, Mr. Carlson and Mr. Karren from:

> (1) infringing upon, marketing, disseminating, and/or selling the MyGym Fitness
> System, the MyGym tradename and mark, related trade dress and any other trade
> secrets and confidential information or materials associated therewith;
>
> (2) withholding from or failing to return to Engle any and all MyGym related
> materials and equipment in its possession;
>
> (3) withholding from or failing to account for and pay to Engle royalties owing for
> past use of the MyGym Fitness System and Trademarks;
>
> (4) competing with Engle in violation of the Covenant Not to Compete described
> in ¶ 11 of the License Agreement executed by and between Engle and MyGym;
> and
>
> (5) disseminating or otherwise revealing confidential information in violation of
> the Confidentiality Agreements executed by and between Engle and Carlson and
> Karren and the confidentiality clause found at ¶ 7.2 of the License Agreement.

(Engle's Mem. Supp. Mot. Prelim. Inj. at 2.)

## ANALYSIS

"A preliminary injunction is an extraordinary remedy; it is the exception rather than the

rule."  GTE Corp. v. Williams, 731 F.2d 676, 678 (10th Cir. 1984).  The burden is "especially

heavy" when "the relief sought would in effect grant plaintiff a substantial part of the relief it

would obtain after a trial on the merits."  Id. at 679.

To obtain preliminary injunctive relief, Mr. Engle must establish that (1) there is a substantial likelihood of success on the merits of his claims; (2) he will suffer irreparable injury unless the court issues the injunction; (3) the threatened injury to Mr. Engle outweighs damage the proposed injunction would cause MyGym LLC, Mr. Carlson, and Mr. Karren; and (4) the injunction, if issued, would not be adverse to the public interest.  Schrier v. University of Colo., 427 F.3d 1253, 1258 (10th Cir. 2005); see also 15 U.S.C. § 1116(a) (providing district courts with jurisdiction and authority to grant injunctions "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent violation of the right of the registrant of a mark" under 15 U.S.C. § 1125(a)) (emphasis added).  Moreover, because Mr. Engle seeks a disfavored injunction,[5] his motion "'must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.'"  Id. at 1259 (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004) (en banc)).  Mr. Engle must "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on [the Tenth Circuit's] modified likelihood-of-success-on-the-merits standard."  O Centro, 389 F.3d at 976.

_____

[5]The Tenth Circuit has identified three historically disfavored preliminary injunctions: (1) those that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that give the movant all relief it could obtain after a trial on the merits.  O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004) (en banc).  Mr. Engle seeks a mandatory preliminary injunction, which is the type of injunction that "'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'"  Schrier, 427 F.3d at 1261 (quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1099 (10th Cir. 1991)).

Although Mr. Engle alleges numerous causes of action in his counterclaim and third-party complaint, he seeks preliminary injunctive relief only on his claim for breach of the License Agreement and his claims for trademark infringement and unfair competition.

**1.      Likelihood of Success on the Merits**

         a.       Breach of the License Agreement

Principally, Mr. Engle contends that MyGym LLC has breached the License Agreement by failing to pay him royalties and by contesting Mr. Engle's ownership of intellectual property rights to the MyGym trademark, trade dress, and fitness equipment.[6] Mr. Engle also points to Paragraph 13 of the License Agreement, in which MyGym LLC acknowledged that a breach would leave Mr. Engle with "no remedy at law" and that Mr. Engle is entitled to injunctive relief.

MyGym LLC counters that Mr. Engle materially breached the License Agreement when it was executed, because, contrary to his representations, he did not have rights to the "MyGym" mark or rights in a pending patent application on the effective date of the License Agreement. Consequently, according to MyGym LLC, Mr. Engle does not have the right to enforce against an alleged subsequent breach by MyGym LLC.

"The law is well settled that a material breach by one party to a contract excuses further performance by the nonbreaching party.  Also, a party seeking to enforce a contract must prove performance of its own obligations under the contract."  Eggett v. Wasatch Energy Corp., 94 P.3d 193, 199 (Utah 2004) (quoting Holbrook v. Master Prot. Corp., 883 P.2d 295, 301 (Utah Ct.

---

[6]Mr. Engle also contends that Mr. Carlson and Mr. Karren have breached Confidentiality Agreements.  Assuming such agreements were properly executed (for example, Mr. Carlson disputes even signing such an agreement), the record contains no evidence that any confidential information has been disclosed.  Accordingly, the court does not find Mr. Engle's claims of breach of the confidentiality agreements persuasive and it will not consider them in the analysis.

App. 1994)).  <u>See also</u> <u>Aquagen Int'l, Inc. v. Calrae Trust</u>, 972 P.2d 411, 414 (Utah 1998)

("performance cannot be compelled when the non-failing party to a contract fails to receive that

which has been bargained for").  The question of whether a breach is material is one of fact.

<u>Coalville City v. Lundgren</u>, 930 P.2d 1206, 1209 (Utah Ct. App. 1997).

There is no question that, at the time the License Agreement was executed, Mr. Engle did

not own the rights described in the License Agreement and so he misrepresented the value of

what he brought to the bargaining table.  But it appears that none of the parties truly understood

the legal implications of the terms, and, further, Mr. Carlson and Mr. Karren did expect that

some future applications would be necessary.  Indeed, Mr. Carlson's and Mr. Karren's

expectations are demonstrated by the parties' actions (and inactions) after the License Agreement

was executed.

First, when the parties to the License Agreement amended it on February 1, 2005, they

did not change any of the recitals containing the misrepresentations which they now claim to be

material.  In fact, they specifically re-iterated the un-amended portions of the License Agreement,

including Recitals A and B (which contained the misrepresentations).

Second, when Mr. Engle sent his May 2005 "intent to use" trademark registration

application to the United States Patent and Trademark Office, he did so with the full knowledge

and cooperation of MyGym LLC, who along with Mr. Engle retained the attorney to file the

application.  Moreover, that application lists Vince Engle as the owner.

Third, after MyGym LLC received notice from Gym Consulting, Inc. in June 2005 about

a possible infringement lawsuit, MyGym LLC did not attempt to void the License Agreement

based on a purported lack of value of what Mr. Engle provided at the company's inception.[7]   The

same can be said about Mr. Engle's August 2005 letter demanding payment of royalties.

      Fourth, the stated reason that MyGym LLC did not pay the royalties to Mr. Engle was that

they did not have the money to pay.   No mention was made, until litigation was on the horizon in

the summer and fall of 2006, of the value of the intellectual property licensed by Mr. Engle in

December 2004.

      Fifth, in August 2005, Mr. Carlson wrote a letter to Mr. Engle detailing Mr. Carlson's

specific concerns about his and MyGym LLC's relationship with Mr. Engle.   (See Aug. 24, 2005

Letter from Wayne Carlson to Vince Engle (Def.'s Ex. V).)   Nowhere in the letter does he raise

an issue regarding representations made when the License Agreement was executed on

December 1, 2004, much less the materiality of such representations.

      For all of these reasons, the court finds, at this preliminary stage, that Mr. Engle did not

materially breach the License Agreement in the manner asserted by MyGym LLC.   Accordingly,

he may follow through on his breach of contract claim.

      It appears from the record that MyGym LLC has not satisfied its obligations to pay

royalties to Mr. Engle.   Further, there is no question that MyGym LLC is now contesting Mr.

Engle's intellectual property rights in apparent disregard of language in ¶ 7.3 of the License

Agreement.   Finally, regardless of the efforts (financial or otherwise) made by other principals at

MyGym LLC, the language of the License Agreement contemplates that Mr. Engle alone reaps

---

     [7]Even after the parties settled with Gym Consulting, Inc. on March 1, 2006, no inkling of
MyGym LLC's claim of failure of consideration arose until July 2006, in the letter from Kirton &
McConkie to Mr. Engle.   (See July 31, 2006 Letter from David Tingey, Esq. of Kirton &
McConkie, to MyGym LLC and its principals (Def.'s Ex. O).)

the benefit of those efforts when it comes to ownership of the MyGym intellectual property rights.

At this preliminary stage, Mr. Engle has established a likelihood of success on his claim for breach of the License Agreement.

      b.    <u>Trademark Infringement and Unfair Competition</u>

To establish likelihood of success on the merits of his trademark and unfair competition claims, Mr. Engle must establish that the mark is valid and legally protected, that he owns it, that MyGym LLC has used the trademark in commerce without his permission, and that there is likelihood of confusion as to the source of the MyGym fitness equipment. 15 U.S.C. §§ 1114, 1125(a); <u>Universal Money Ctrs., Inc. v. AT&T Co.</u>, 22 F.3d 1527, 1529 (10th Cir. 1994).

There is no dispute that the mark is federally registered in Mr. Engle's name, and that MyGym LLC has used (or intends to use) the mark even after Mr. Engle's termination of the License Agreement.  Still, even though the mark is registered (as of October 10, 2006), MyGym LLC has possible defenses under 15 U.S.C. § 1115(b).  <u>See also</u> <u>GTE Corp.</u>, 904 F.3d at 540 n.3 (citing 15 U.S.C. § 1065, the court stated that, with some exceptions, "a mark becomes incontestable if continuously used for five consecutive years after registration, provided it does not infringe valid rights acquired by common law usage before the date of publication of the registered mark.").  It is not clear whether MyGym LLC has raised (or is going to raise) specific defenses under this statutory provision,[8] but certainly MyGym has raised questions about Mr. Engle's ownership of the mark under the Lanham Act.  Also, certain issues arise regarding

---

[8]MyGym LLC, Mr. Carlson, and Mr. Karren have not yet answered Mr. Engle's Counterclaim and Third-Party Complaint.

the"likelihood of confusion" element.

"The key to proving trademark infringement is showing a likelihood of confusion as to the source of the product or service." GTE Corp. v. Williams, 731 F.2d 676, 678 (10th Cir. 1984) (citing 15 U.S.C. § 1114); see also King of the Mountain Sports, Inc. v. Chrysler Corp., 185 F.3d 1084, 1089 (10th Cir. 1999) ("Likelihood of confusion forms the gravamen for a trademark infringement action.") (citing 15 U.S.C. §§ 1114, 1125). The same can be said for Mr. Engle's claims of trade dress infringement and unfair competition under the Lanham Act. See id.; 15 U.S.C. §§ 1114, 1125(a) (containing requirements of likelihood of confusion). See also Amoco Oil, Co. v. Rainbow Snow, 748 F.2d 556, 558 (10th Cir. 1984) (holding that determinations of liability in trademark, trade dress, and unfair competition under Utah law are made according to standards set forth in Lanham Act).[9]

Mr. Engle notes that the Tenth Circuit has identified six factors, derived from the Restatement of Torts § 729, that aid in determining whether a likelihood of confusion exists (which is a question of fact). Those factors are (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) the relation in use and the manner in marketing between the goods or services marketed by the competing parties; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks. King of the Mountain, 185 F.3d at 1089-90. This list is not exhaustive, the factors are "interrelated," and "no one factor is dispositive." Id. But the factual situation in King of the Mountain is different, so its factor-by-factor analysis is not easily

---

[9]If Mr. Engle's state law claims require analysis of a different set of elements, the parties have not briefed the issue (they focus solely on federal trademark law) and so the court will not consider it here.

transferred to the MyGym case.  For instance, the court in <u>King of the Mountain</u> was evaluating

two competing marks, not the same mark.  Moreover, it was assessing the response that a

consumer would have at the point of advertising to the allegedly similar marks.  So, rather than

apply the factors individually, Mr. Engle claims likelihood of confusion in two circumstances.

First, he cites to actual confusion on the part of Bay Street.  But Bay Street is not

confused about the source of the product or service.  Rather, Bay Street is concerned (for

practical business reasons) about who is legally entitled to control the MyGym brand.  Moreover,

Bay Street is not a consumer of the MyGym fitness equipment in the manner contemplated by the

trademark infringement law.  <u>See, e.g.</u>, <u>Continental Plastic Containers v. Owens Brockway</u>

<u>Plastic Products, Inc.</u>, 141 F.3d 1073, 1080-81 (Fed. Cir. 1998) (noting that, to determine

likelihood of confusion, court must identify the relevant consumer base, and that inquiry centers

on "confusion of consumers in the market for the particular product at issue").  Here there is no

evidence that a person buying the MyGym Fitness System through direct marketing or through a

retailer like Wal-Mart would be concerned with, much less confused by, the question of whether

the source of the product is Vince Engle or MyGym LLC.

Second, Mr. Engle contends that use of the exact same mark in the same market is a

conclusive factor in finding likelihood of confusion.  <u>See, e.g.</u>, <u>S&R Corp. v. Jiffy Lube Int'l,</u>

<u>Inc.</u>, 968 F.2d 371, 375 (3d Cir. 1992) ("concurrent use [of exact same trademark] is highly likely

to cause consumer confusion about [the franchisee's] affiliation with the franchise"); <u>Burger</u>

<u>King Corp. v. Mason</u>, 710 F.2d 1480, 1492 (11th Cir. 1983) ("Common sense compels the

conclusion that a strong risk of consumer confusion arises when a terminated franchisee

continues to use the former franchisor's trademark's.").  But this case is different.  Mr. Engle and

MyGym LLC are not competing.  They are not operating businesses simultaneously.  Rather, Mr.

Engle wants to substitute himself for MyGym LLC in the market.  Right now, there is no

situation that would cause the confusion identified in the above-cited cases because there is no

competition to be confused about.  This case is not as simple as Mr. Engle suggests.  Mr. Engle

was intimately involved in the formation of MyGym LLC.  He was involved in many decisions

that not only created income for the company but also created financial obligations.  He is not so

easily separated from the entity.  In other words, his relationship with MyGym LLC, Mr. Carlson,

and Mr. Karren is much more involved than the cases of, for example, a franchisor and

franchisee, or a straightforward licensor/licensee relationship.  For these reasons, it is not clear to

the court that a likelihood of consumer confusion is imminent.

Still, even if Mr. Engle were to establish a clear likelihood of success on the merits of his

trademark and unfair competition claims, he cannot establish irreparable harm.

**2.    Irreparable Harm**

Harm is irreparable when it cannot be measured and is not compensable with monetary

damages.  Dominion Video Satellite, Inc. v. Echostar Satellite Corporation, 356 F.3d 1263 (10th

Cir. 2004) (irreparable harm determinations consider factors such as "inability to calculate

damages, harm to goodwill, diminishment of competitive positions in marketplace . . . and lost

opportunities to distribute unique products").  The injury must be "certain, great, actual and not

theoretical."  Schrier, 427 F.3d at 1267 (internal citations omitted); see also Dominion Video,

356 F.3d at 1262 (irreparable injury "must be both certain and great, and . . . must not be merely

serious or substantial").

a.      Breach of License Agreement Claim

Mr. Engle points to language in the License Agreement in which the parties stipulated

that

> if [MyGym LLC] breaches this Agreement . . ., [Engle] shall have no adequate
> remedy at law.  Therefore, [MyGym LLC] expressly consents and agrees that
> [Engle] may, in addition to any other available remedies, obtain an injunction
> and/or temporary restraining order to terminate or prevent the continuation of any
> existing default or violation, and to prevent the occurrence of any threatened
> default or violation by Licensee of this License Agreement, and that such
> injunction or order may be issued without the necessity of posting bond.

(Id. ¶ 13 (emphasis added).)  Such a provision does not settle the question of irreparable harm.

In Dominion Video Satellite, Inc. v. Echostar Satellite Corporation, 356 F.3d 1256 (10th
Cir. 2004), the Tenth Circuit addressed a situation in which the agreement at issue contained a
similar provision.  In that case, "[t]he Agreement state[d] that should either party breach the
agreement, money damages would be insufficient, the harm from the breach would be
irreparable, and the non-breaching party would have the right to obtain specific performance or
injunctive relief."  Id. at 1259 (summarizing language of contract).  But based on the specific
circumstances of the case, the Tenth Circuit found that no irreparable harm had been established.
The court noted that:

> [w]hile courts have given weight to parties' contractual statements regarding the
> nature of harm and attendant remedies that will arise as a result of a breach of a
> contract, they nonetheless characteristically hold that such statements alone are
> insufficient to support a finding of irreparable harm and an award of injunctive
> relief. . . . Instead, the courts also identify other factors which establish that the
> harm is indeed irreparable.

Id. at 1266 (internal citations omitted).  Clearly, the parties' stipulation in Dominion Video
carried little, if any, weight in the Tenth Circuit's analysis of whether irreparable harm existed.

20

In the case here, the parties' stipulation also does not carry much weight, because the economic damages can be measured (indeed, Bay Street's representative noted that sales could be easily accounted for if only Bay Street knew which of the two parties it should deal with). Any profits from sales that MyGym LLC makes can be fully accounted for, as can overdue royalty payments. As for injury caused by MyGym LLC's challenge to Mr. Engle's intellectual property rights, any purported irreparable harm is inextricably intertwined with irreparable harm under the trademark and unfair competition claims, and that issue is addressed below.

In short, on the basis of Mr. Engle's contract claim alone, the court finds that he has not established irreparable harm.

      b.    <u>Trademark Infringement and Unfair Competition Claims</u>

Typically, a finding of infringement creates a presumption of irreparable harm. <u>E.g.</u>, <u>GTE Corp.</u>, 731 F.2d at 678. But that presumption is not a given. "Despite the general acknowledgment that irreparable harm often arises from the breach of [exclusive licensing agreements], courts do not automatically, nor as a matter of course, reach this conclusion. Rather, they examine whether the harms alleged by the party seeking the preliminary injunction are in fact irreparable, and sometimes conclude in the negative." <u>Dominion Video Satellite</u>, 356 F.3d at 1260. <u>See also</u> <u>Ebay Inc. v. Mercexchange, L.L.C.</u>, 126 S. Ct. 1837 (May 15, 2006) (holding that injunctions under patent law should not be automatically granted upon finding of infringement, that the presumption of injury should not result in categorical grant of relief, and that courts must exercise discretion under traditional principles of equity). Right to relief, especially in the context of a request for disfavored injunctive relief, must be "clear and unequivocal." <u>Dominion Video Satellite</u>, 356 F.3d at 1261 (quoting <u>SCFC ILC, Inc. v. Visa</u>

USA, Inc., 936 F.2d 1096, 1098 (10th Cir. 1991)).  In this case, considering all of the

circumstances (including the parties' business venture relationship and their pre-litigation focus

on quantifiable financial injuries) and given the high standards that apply here, the court finds

that Mr. Engle has not satisfied his burden to establish irreparable harm.

       The court finds the case of Dialogo, LLC v. Santiago-Bauza, 425 F.3d 1 (1st Cir. 2005),

to be very persuasive.  In Dialogo, the First Circuit denied a motion for preliminary injunction in

a trademark infringement case filed under the Lanham Act.  The court described the situation as

"an ill-fated business arrangement" between an entity (DMSA) and an individual (Lillian

Santiago) who together formed Dialogo, LLC to publish a bilingual newspaper (El Dialogo) in

Massachusetts.  DMSA provided the initial capital.  Ms. Santiago brought the publication (which

she had been operating at a loss) to the venture.  Approximately eight months after the parties

formed their business venture, Ms. Santiago told DMSA that she was closing the business.  But

she continued to publish El Dialogo through her new entity, El Dialogo LLC.  DMSA sued,

alleging claims for trademark infringement, misappropriation of trade secrets, and breach of

contract.  DMSA also sought a preliminary injunction preventing Ms. Santiago from using the

title "El Dialogo," disclosing proprietary information, and using the physical assets of Dialogo,

LLC.  The First Circuit found no irreparable harm, even for the trademark infringement claims:

> Although there is law to the effect that irreparable injury is presumed in
> infringement cases where the plaintiff shows a likelihood of success [citation
> omitted], this case does not fit the mold.  Irreparable–or at least
> unquantifiable–injury may be fairly likely where two business are vying for the
> same customers  using the same trademark or two marks that can be confused
> with one another.  There, every customer diverted to a defendant may be an
> undetectable loss, even a permanent one, to the plaintiff.  Thus, a presumption of
> irreparable injury makes some sense.

> This case is quite different.  Here, from DMSA's own version of the events,
> Santiago is conducting the Dialogo, LLC business under her new company's name
> and DMSA is publishing no similar newspaper.  DMSA does not claim that
> Santiago is running the business into the ground; the question is whether a share
> of profits (if any), and ultimately the business itself, should be restored to
> Dialogo, LLC.  The kind of irreparable injury that ordinarily underpins the
> presumption is not present here; for all we can tell, everyone will be better off
> with a continuation of the business by Santiago for the time being and a swift trial.

Dialogo, LLC v. Santiago-Bauza, 425 F.3d 1, 4 (1st Cir. 2005).  See also Kitty Walk Sys., Inc. v. Midnight Pass Inc., 431 F. Supp. 2d 306, 309 (E.D.N.Y. 2006) (noting that district court denied preliminary injunctive relief to owners of trademark and patent rights who sued business partner after business venture deteriorated, because defendants distributed authentic products about which there was no confusion).

The case here also "does not fit the mold" of a typical trademark infringement or licensing dispute.  Mr. Engle relies on the presumption of irreparable harm,[10] but the presumption is not properly invoked here for essentially the same reasons articulated in Dialogo.  And he has no evidence to back up his conclusory statements that he will suffer the loss of goodwill, injury to his reputation, loss of trade, and dilution of the MyGym mark.  For these reasons, the court finds that Mr. Engle has not established that he will suffer irreparable injury if an injunction is not granted.

**3.      Balance of the Harms and Public Interest**

Regardless of how the court rules, both parties will suffer harm.  Granting an injunction would prevent MyGym LLC from using its only valuable assets.  It is possible that MyGym LLC

---

[10]Mr. Engle also relies heavily on the unreported case of Tsunami Softgoods, Inc. v. Tsunami Int'l, Inc., Case No. 2:00CV738K (D. Utah Jan. 19, 2001), to support his position. Tsunami is distinguishable because there the court was not faced with the complications of estranged business venture partners and a contestable trademark.

would go out of business in the interim (its only source of income would be denied), and a substantial amount of money (and labor) would be lost by investors.  Moreover, Bay Street (MyGym LLC's exclusive distributor) will remain in limbo.  On the other hand, denying an injunction will prevent the registered owner of the trademark from controlling his intellectual property in the interim and will delay direct financial benefit from the sale of that property until after a decision on the merits has been issued (assuming he succeeds on his claims).

The public has an interest in preventing both types of harms.  So the "public interest" factor does not weight in favor of either side.

But the balance of harms weighs in favor of MyGym LLC.  There is evidence in the record that MyGym LLC and its principals, including not only Mr. Engle but Mr. Carlson and Mr. Karren, provided much labor and capital to develop value in MyGym LLC, particularly the MyGym mark, related trade dress, and potential patent rights.  MyGym LLC's sole purpose is to further develop, market, and sell the MyGym products.  If Mr. Engle obtains the injunctive relief he requests, he will essentially be getting everything he requests in his complaint but without a full trial on the merits.  And MyGym LLC (and Mr. Carlson and Mr. Karren) will be left with little, if anything (the court does not agree that this is a case of self-inflicted harm, as was alleged in Tsunami).  This is particularly problematic because MyGym LLC has not had a full opportunity to present its defenses to Mr. Engle's trademark infringement and unfair competition claims.  For these reasons, the court finds that Mr. Engle has not established that the balance of harms weighs in favor of granting injunctive relief.

## CONCLUSION

Mr. Engle has failed to meet the heavy burden applicable to preliminary injunctive relief.

While Mr. Engle may ultimately prevail on some, or perhaps even all, of his claims, he has not

established irreparable harm.  Further, consideration of the balance of the parties' potential harms

supports the conclusion that a preliminary injunction is inappropriate in this case.

### ORDER

For the foregoing reasons, Mr. Engle's Motion for Preliminary Injunction is DENIED,

and Mr. Engle's Motion to Strike Portions of Declaration of Dale Karren is DENIED AS MOOT.

DATED this 6th day of December, 2006.

BY THE COURT:

TENA CAMPBELL
United States District Judge

25